UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:05CR-19 (JCH) |
| | : | |
| v. | : | **VIOLATIONS**: |
| | : | 18 U.S.C. § 371: [Conspiracy]; |
| VIKTOR NOVOSSELOV, | : | 15 U.S.C. §§ 77q(a), 77x: [Securities Fraud]; |
| a/k/a "VIKTOR NOVOSELOFF" | : | 18 U.S.C. § 2: [Aiding and Abetting]; |
| a/k/a "DAVID MARKOWITZ" | : | 28 U.S.C. § 2461 and 18 U.S.C. §§ 981 and |
| | : | 982: [Forfeiture] |

**INFORMATION**

The United States Attorney Charges:

**COUNT ONE**
**(18 U.S.C. § 371)**
**Conspiracy to Commit Mail Fraud,**
**Securities Fraud, and Money Laundering**

**Introduction**

At all times relevant to this Information:

1.      Defendant VIKTOR NOVOSSELOV, also known as "David Markowitz" and as "Viktor Novoseloff" ("NOVOSSELOV"), resided in the State of New York and conducted financial transactions through various accounts including business accounts in the name of Blue Square Management, Inc. and personal accounts in the name of David Markowitz.

2.      Igor Malyar, who is not a defendant herein, also known as "George Falcone" and as "Michael Safir" ("Malyar") resided in the State of New York and worked at Blue Square Management, Inc., including running the day-to-day office operations.

3.      NOVOSSELOV, using the name David Markowitz, held himself out as president

and principal officer of Blue Square Management, Inc.

4.  Blue Square Management, Inc. (referred to herein as "Blue Square Management" and "Blue Square"), a New York Corporation that conducted business from various locations in New York, including: 225 Broadway, Suite 1905, New York, NY, 10007; 246 West 38th Street, New York, NY, 10018; 120 Stuyvesant Place, Suite 415, Staten Island, NY, 10301; and 1328 Broadway, Rm 524, New York, NY 10001, and which was previously located on the Internet at www.bluesquaremanagement.com, purported to be a venture capital firm in the business of selling securities and specializing in underwriting initial public offerings; however, at no time material to this Information was Blue Square registered with the Securities and Exchange Commission ("SEC") as an investment company, investment advisor, broker dealer, or in any other capacity, nor was Blue Square registered with the National Association of Securities Dealers ("NASD") in any capacity.

5.  NOVOSSELOV controlled bank accounts at numerous financial institutions, opened in the name of David Markowitz and in the name of Blue Square Management, including accounts at Citibank, JP Morgan Chase ("Chase"), HSBC Bank USA ("HSBC"), Sterling National Bank ("Sterling"), and North Fork Bank, which are engaged in, and the activities of which affect, interstate and foreign commerce.

6.  Cash Money Lending Corp. (referred to herein as "Cash Money Lending Corp." and "CMLC") was a fictitious corporation, purportedly in the business of managing ATM machines that the defendant and his co-conspirators represented to investors to be an actual company, in which the investors could purchase securities.

7.  NOVOSSELOV and Malyar, acting as officers of Blue Square Management,

working together and with other individuals known and unknown to the United States Attorney,
conducted business throughout the United States, in among other places, the State of
Connecticut, specifically by placing telephone calls, mailing correspondence, soliciting
investment funds, selling fictitious securities to numerous investor-victims, and receiving funds
from investor-victims intended for investment, including investors located in the District of
Connecticut.

8.      Individual victim-investor-purchasers who are specifically referenced in this
Information and whose identities are known to the United States Attorney, are referred to in this
Information by their initials as "H.T.C.," "P.R.P.," "A.V.K.," and "G.W.S."

### The Conspiracy

9.      Beginning in or about January 2001, and continuing until in or about March 2004
in the District of Connecticut and elsewhere, the defendant,

VIKTOR NOVOSSELOV,

together with Igor Malyar and others, both known and unknown to the United States Attorney,
did knowingly combine, conspire, confederate, and agree together and with each other, to commit
offenses against the United States as follows:

a.      knowingly to devise and intend to devise a scheme and artifice to defraud and to
obtain money and property by means of materially false and fraudulent pretenses,
representations, and promises, and knowingly, with intent to defraud, cause to be
placed in a United States Post Office or other authorized depository for mail
matter, items to be sent and delivered by the United States Postal Service
according to the directions thereon, and caused to be deposited items to be sent

and delivered by private and commercial interstate carriers, for the purpose of

executing such scheme and artifice, in violation of 18 U.S.C. § 1341;

b.     to willfully, by use of means and instruments of interstate commerce and by use of

the mails, in the offer and sale of securities, (1) employ a device, scheme, and

artifice to defraud, (2) obtain money and property by means of untrue statements

of material facts and omissions to state material facts necessary in order to make

the statements made not misleading, in light of the circumstances under which

they were made, and (3) engage in transactions, practices, and courses of business

that operated as a fraud and deceit upon the purchasers of these securities, in

violation of 15 U.S.C. §§ 77q(a) and 77x;

c.     to conduct and attempt to conduct a financial transaction affecting interstate

commerce, which transaction involved the proceeds of specified unlawful

activities, that is securities fraud and mail fraud, knowing that the transaction was

designed in whole and in part to conceal and disguise the nature, location, source,

ownership, and control of the proceeds of said specified unlawful activity, that is

securities fraud and mail fraud, and that while conducting and attempting to

conduct such financial transaction knew that the property involved in the financial

transaction represented the proceeds of some form of unlawful activity, in

violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

d.     knowingly to engage and attempt to engage in monetary transactions in criminally

derived property of a value greater than $10,000 and which was derived from a

specified unlawful activity, that is securities fraud and mail fraud, in violation of

18 U.S.C. § 1957.

## Purpose of the Conspiracy

10.    The purpose of the conspiracy was for the defendant and his co-conspirators to enrich themselves by fraudulently obtaining money from numerous investors, including investors in the District of Connecticut, through the sale of securities that were purportedly issued by, or on behalf of, the company CMLC which was purportedly in the business of managing ATM machines and by falsely representing to the investors that the funds they provided had been and would be used to purchase such securities.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish said conspiracy included, among others, the following:

11.    It was a part of the conspiracy that defendant NOVOSSELOV, using the name David Markowitz, held himself out to be an officer of Blue Square, which the defendant and his co-conspirators described as a New York City venture capital firm that raised money for private companies.

12.    It was a further part of the conspiracy that, in order to create the appearance of legitimacy, defendant NOVOSSELOV and his co-conspirators set up and maintained a publicly accessible, multi-page website describing Blue Square's purported venture capital business and investment philosophy.  The website portrayed the business in positive but general terms, and did not provide details such as names of clients, officers, directors, or employees.  The website contained false and misleading representations, including, but not limited to:

A.    That "[a]s a leading venture capital firm, Blue Square

Management has the industry expertise and capital to launch the
next wave of great companies;"

B.  That Blue Square has "invested in companies across the board in
the technology, finance, medical and e-commerce industries;"

C.  That Blue Square has "over 60 years of combined experience in
the financial markets;" and

D.  That "Blue Square Management's Investment Banking Group's
seasoned processionals have global experience with the full menu
of alternative and/or complementary corporate financial services."

13.  It was a further part of the conspiracy that defendant NOVOSSELOV and his
co-conspirators using the name Markowitz, among others, would and did obtain money from
investors throughout the United States, including investors in the District of Connecticut, by
making unsolicited telephone calls to them (i.e., "cold calling") and falsely and fraudulently
representing, among other things, that:

A.  Blue Square was a New York City based venture capital firm that
was offering them the opportunity to invest in a private ATM-
management company named CMLC;

B.  CMLC operated a lucrative business managing thousands of ATMs
across the country;

C.  the initial public offering for CMLC, and/or a buy-out of the
company, would occur in the near future and as such the investors
who purchased stock pre-IPO and/or pre-buyout would make a
significant profit;

D.  in addition to purchasing stock, investors could receive warrants
which would also be of significant value; and

E.  investors could purchase CMLC stock for $7 to $10 per share,
which was represented to be one-third to one-half the planned IPO

- 6 -

or buy-out price,

when in truth and in fact, CMLC was a fictitious entity with no actual operations, did not manage

thousands of ATMs across the country, and there was no planned IPO.

14.     It was a further part of the conspiracy that, following the verbal solicitation

of investments made during the cold-calls, defendant NOVOSSELOV and his co-conspirators, in

an attempt to lure and entice investors, distributed and caused to be distributed certain

promotional materials about CMLC to prospective investors that expanded upon the solicitations

and contained false and misleading representations, including, among other things, that:

A.     Blue Square would be an underwriter for Cash Money Lending Corp.;

B.     CMLC began its operations in 1995;

C.     CMLC was an independent ATM management company uniquely
         positioned to serve a wide range of customers, from financial services
         companies and chain stores to individual merchants and private investors.

D.     CMLC actively managed over 6,000 ATM machines and is one of the
         fastest growing companies in the ATM Industry;

E.     CMLC offered a full line of brand-name equipment, "installation &
         training," and maintenance; and

F.     CMLC used new technology to "push profits to new heights,"

when in truth and in fact, CMLC was a fictitious entity with no actual operations, did not manage

thousands of ATMs across the country, and had no profits.

15.     It was a further part of the conspiracy that, to further create the appearance of

legitimacy, after prospective investors expressed an interest in investing, defendant

NOVOSSELOV and his co-conspirators sent the investors official looking documents that

contained false and misleading representations tending to corroborate the misrepresentations

made over the phone.  Such documents included:

A.   Stock Certificates bearing the name Cash Money Lending Corp. that certified that the individuals whose name appeared on the certificate were the owners of shares of "the Corporation," referring to Cash Money Lending Corp.;

B.   Subscription Agreements for the purchase of common stock of Cash Money Lending Corp. and stating, among other things, that the investor is purchasing the shares for his own account with the intention of holding the Shares for investment; and

C.   Invoices, signed on behalf of Blue Square Management under the name David Markowitz, Senior Vice President, and setting forth the number of shares the investor had agreed to purchase, the payments owed, and the estimated opening price,

when in truth and in fact, the stock certificates were bogus, as CMLC was a fictitious entity with no actual operations and, as there was no planned IPO, the "estimated opening price" was also fictitious.

16.   It was further part of the conspiracy that the defendant NOVOSSELOV and his co-conspirators caused more than 50 investors to send Blue Square "investments" of more than $2.5 million and Malyar, along with others members of the conspiracy, would and did collect the "investment" checks, prepare them for deposit into one of the Blue Square bank accounts, and would and did deposit and cause others to deposit the "investment" checks into one of the Blue Square accounts.

17.   It was further part of the conspiracy that the defendant NOVOSSELOV and his co-conspirators failed to invest the money as represented, but instead diverted investors' funds for their own personal use and benefit, including paying business expenses, and converting large amounts of the funds into cash.

18.     It was further part of the conspiracy that the defendant NOVOSSELOV, who had been assigned Social Security account number XXX-78-5767 (the entire number known to the United States Attorney) by the Commissioner of Social Security on or about June 13, 1991 in the name of VIKTOR NOVOSSELOV and the date of birth of April 29, 1967, did with intent to deceive, falsely represent an additional Social Security account number to be the number assigned to him and used an additional Social Security account number acquired, directly or indirectly, on the basis of false information furnished to the Commissioner, namely Social Security Account Number XXX-84-7474 (the entire number known to the United States Attorney) that was assigned by the Commissioner in the exercise of his authority under Title 42 on or about April 15, 1996, in the name of David Markowitz and the date of birth of August 12, 1979.

19.     It was further part of the conspiracy that the defendant NOVOSSELOV, having acquired the Social Security account number in the name of David Markowitz, used that number to facilitate the diversion of investors' funds as follows:

    A.     by acquiring a New York State identification card in the name of David Markowitz and with his, NOVOSSELOV'S, photograph;

    B.     by acquiring a visa credit card from Providian Bank in the name of David Markowitz;

    C.     by using the New York State identification card, visa credit card and the above-described Social Security account number in the name of David Markowitz, to open bank accounts in the name of Blue Square and David Markowitz; and

    D.     by moving investor funds through the above described accounts that were opened in the name of David Markowitz and Blue Square by

electronic funds transfer and by negotiating multiple checks using

the New York State identification card as identification.

20.     It was further part of the conspiracy that defendant NOVOSSELOV would and did maintain and use bank accounts that he opened in the name of Blue Square, including Chase, Sterling National Bank, Citibank, HSBC, and North Fork Bank.

21.     It was a further part of the conspiracy that defendant NOVOSSELOV would and did maintain and use bank accounts that he opened and caused to be opened in the name of David Markowitz at financial institutions including Citibank.

22.     It was a further part of the conspiracy that defendant NOVOSSELOV in an attempt to conceal the nature and source of funds received by Blue Square from the sale of CMLC stock, would and did engage in monetary transactions in criminally derived property, which was derived from securities fraud and mail fraud, by negotiating checks and executing electronic funds transfers to move the fraudulent proceeds from one account to another.

23.     It was a further part of the conspiracy that defendant NOVOSSELOV, and his co-conspirators, in an attempt to conceal the nature and source of funds received by Blue Square from the sale of CMLC stock, would and did cash checks made to the order of Blue Square and David Markowitz.

24.     It was a further part of the conspiracy that defendant NOVOSSELOV in an attempt to conceal the nature and source of funds received by Blue Square from the sale of CMLC stock, would and did use automatic teller machines to obtain cash, generally in blocks of $500.00, from the Blue Square accounts at various banks, the source of funds for the cash withdrawals being the fraudulently obtained proceeds.

25.     It was a further part of the conspiracy that defendant NOVOSSELOV and his co-conspirators, would and did engage in monetary transactions in criminally derived property of a value greater than $10,000, the source of such funds having been derived from securities fraud and mail fraud, by negotiating checks, depositing checks and executing electronic funds transfers in amounts greater than $10,000.

26.     It was further part of the conspiracy that defendant NOVOSSELOV and his co-conspirators diverted and dissipated investors' funds by transferring the monies to multiple accounts by way of check and funds transfers and then withdrawing cash from those accounts by way of checks made payable to Markowitz and to cash and cashing the checks using the New York State identification card, and withdrawing cash from those accounts by executing multiple ATM withdrawals.

27.     It was a further part of the conspiracy that defendant NOVOSSELOV and his co-conspirators, after having concealed and disguised the nature, location, source, ownership, and control of funds obtained by Blue Square from investors in CMLC, would and did fail to invest the money as had been represented, but instead diverted and caused to be diverted investors' funds for the personal use and benefit of members of the conspiracy, including converting large amounts of the funds into cash to be distributed to members of the conspiracy.

28.     It was a further part of the conspiracy that defendant NOVOSSELOV and his co-conspirators, after having concealed and disguised the nature, location, source, ownership, and control of funds obtained by Blue Square from investors in CMLC, would and did fail to invest the money as had been represented, but instead diverted investors' funds for among other purposes, the payment of Blue Square related expenses and other personal expenses.

- 11 -

29.     It was further part of the conspiracy that defendant NOVOSSELOV and his co-conspirators would and did lull investors into believing that their investment funds had been invested into the CMLC securities, as represented, and would and did prevent the discovery of the true use of investors' funds by the investors by, among other ways:

      A.     issuing monthly account statements to investors that purported to show the investor's account activity and balance at Blue Square, including apparent increases in the value of the CMLC investment;

      B.     stating to investors that CMLC had a large amount of debt that was previously unknown that would delay the IPO;

      C.     stating to investors that lawyers were still working on the deal and it would take time to work out the details; and

      D.     stating to investors that there were additional shares that needed to be sold and redistributed before the deal could go forward.

30.     It was further part of the conspiracy that Malyar, using the name Michael Safir, would and did seek to delay and prevent the discovery of the fact that Blue Square was not the successful venture capital firm it had been represented to be, and would and did conceal the fact that Blue Square was vacating its office premises, by continuing to employ the office receptionist to answer phone calls from investors and by continuing to pay her to answer the telephone calls even after the office had been vacated.

- 12 -

<u>Overt Acts</u>

In furtherance of the conspiracy and to effect the objects of the conspiracy, defendant NOVOSSELOV together with Malyar and other co-conspirators committed and caused to be committed the following overt acts, among others, in the District of Connecticut and elsewhere:

31.     On or about August 13, 2001, defendant NOVOSSELOV and his co-conspirators caused an invoice dated August 13, 2001 and setting forth an amount due of $1,000 for securities described as CMLC to be sent from Blue Square to investor P.R.P. of Granby, Connecticut.

32.     On or about August 15, 2001, defendant NOVOSSELOV and his co-conspirators caused investor P.R.P. of Granby, Connecticut, to send Check #6049 in the  amount of $1,000 to Blue Square at 120 Stuyvesant Place, Ste. 415, Staten Island, NY.

33.     On or about October 1, 2001, defendant NOVOSSELOV and his co-conspirators caused a Blue Square brochure for Cash Money Lending Corp. (CMLC) to be sent from Blue Square's offices in New York City to investor G.W.S. in Thomaston, Connecticut.

34.     On or about October  9, 2001, defendant NOVOSSELOV and his co-conspirators caused investor G.W.S. of Thomaston, Connecticut, to send Check #1174 drawn on the Webster Bank in Connecticut, in the amount of $1,000 to Blue Square at 120 Stuyvesant Place, Ste. 415, Staten Island, NY.

35.     On or about October 22, 2001, defendant NOVOSSELOV, using the name David Markowitz, opened a business checking bank account in the name of Blue Square Management Inc., at a branch of Chase in New York City.

36.     On or about November 15, 2001, defendant NOVOSSELOV and his co-conspirators caused investor G.W.S. of Thomaston, Connecticut, to send Check #101 drawn on

the Webster Bank in Connecticut, in the amount of $6,300 to Blue Square at 120 Stuyvesant Place, Ste. 415, Staten Island, NY.

37.     On or about March 26, 2002, defendant NOVOSSELOV, using the name David Markowitz, opened a business checking bank account in the name of Blue Square Management Inc., at a branch of Citibank in New York City.

38.     On or about March 26, 2002, defendant NOVOSSELOV, using the name David Markowitz, opened a business checking bank account in the name of Blue Square Management Inc., at a branch of Sterling National Bank in New York City.

39.     On or about August 29, 2002, defendant NOVOSSELOV and his co-conspirators caused an invoice dated August 29, 2002 and setting forth an amount due of $1,000 for securities described as CMLC to be sent from Blue Square to investor A.V.K. of Ridgefield, Connecticut.

40.     On or about September 6, 2002, defendant NOVOSSELOV and his co-conspirators caused investor A.V.K. of Ridgefield, Connecticut, to send Check #3597 in amount of $1,000 to Blue Square at 120 Stuyvesant Place, Ste. 415, Staten Island, NY.

41.     On or about September 25, 2002, defendant NOVOSSELOV and his co-conspirators caused an invoice dated September 25, 2002 and setting forth an amount due of $6,300 for securities described as CMLC to be sent from Blue Square to investor A.V.K. of Ridgefield, Connecticut.

42.     On or about October 8, 2002, defendant NOVOSSELOV and his co-conspirators caused investor A.V.K. of Ridgefield, Connecticut, to send Check #3633 in the amount of $6,300 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

43.     On or about December 18, 2002, defendant NOVOSSELOV and his co-

conspirators caused investor H.T.C. of Greenwich, Connecticut, to send Check #300 in amount of $2,000 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

44.     On or about February 4, 2003, defendant NOVOSSELOV and his co-conspirators caused investor H.T.C. of Greenwich, Connecticut, to send Check #5198 in amount of $12,600 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

45.     On or about March 4, 2003, defendant NOVOSSELOV and his co-conspirators caused investor H.T.C. of Greenwich, Connecticut, to send Check #307 in amount of $32,000 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

46.     On or about March 18, 2003, defendant NOVOSSELOV and his co-conspirators caused an invoice dated March 18, 2003 and setting forth an amount due of $140,000 for securities described as CMLC to be sent from Blue Square to investor H.T.C. of Greenwich, Connecticut.

47.     On or about March 28, 2003, defendants NOVOSSELOV and his co-conspirators caused investor H.T.C. of Greenwich, Connecticut, to send Check #308 in amount of $140,000 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

48.     On or about March 31, 2003 through April 7, 2003, defendant NOVOSSELOV made multiple cash withdrawals from ATM machines, from the funds having been obtained from investors for the purchase of securities.

49.     On or about April 1, 2003, defendant NOVOSSELOV and his co-conspirators caused an invoice dated April 1, 2003 and setting forth an amount due of $7,000 for securities described as CMLC to be sent from Blue Square to investor A.V.K. of Ridgefield, Connecticut.

50.     On or about April 2, 2003, defendant NOVOSSELOV and his co-conspirators

- 15 -

transferred and caused to be transferred $20,000 by check from Blue Square acct. # 668503520665 at JP Morgan Chase to the Blue Square account # 383778101 at Sterling National Bank by depositing check #1236 drawn on JP Morgan Chase account into the Sterling National Bank account.

51.     On or about April 2, 2003, defendant NOVOSSELOV and his co-conspirators transferred and caused to be transferred $21,000 by check from Blue Square acct. # 668503520665 at JP Morgan Chase to the Blue Square account # 007895372 at HSBC Bank USA by depositing check #1237 drawn on JP Morgan Chase account into the HSBC Bank USA account.

52.     On or about April 3, 2003, defendant NOVOSSELOV and his co-conspirators transferred and caused to be transferred $20,000 by check from Blue Square acct. # 668503520665 at JP Morgan Chase to the Blue Square account #7024069499 at the North Fork Bank by depositing check #1235 drawn on JP Morgan Chase account into the North Fork Bank account.

53.     On or about April 3, 2003, defendant NOVOSSELOV and his co-conspirators transferred and caused to be transferred $20,000 by check from Blue Square acct. # 668503520665 at JP Morgan Chase to the Blue Square account  # 0008953375(C) at Citibank by depositing check #1234 drawn on JP Morgan Chase account into the Citibank account.

54.     On or about April 9, 2003, defendant NOVOSSELOV and his co-conspirators caused investor A.V.K. of Ridgefield, Connecticut, to send Check #3801 in amount of $3,500 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

55.     On or about April 16, 2003, defendant NOVOSSELOV and his co-conspirators

caused investor H.T.C. of Greenwich, Connecticut, to send Check #311 in the amount of $40,000 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

56.     On or about April 30, 2003, defendant NOVOSSELOV and his co-conspirators caused investor H.T.C. of Greenwich, Connecticut, to send Check #219 in the amount of $4,500 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

57.     On or about May 1, 2003, defendant NOVOSSELOV and his co-conspirators caused investor H.T.C. of Greenwich, Connecticut, to send Check #5325 in the amount of $4,500 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

58.     On or about June 18, 2003, defendant NOVOSSELOV and his co-conspirators caused investor H.T.C. of Greenwich, Connecticut, to send Check #316 in the amount of $44,975 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

59.     On or about October 21, 2003, defendant NOVOSSELOV and his co-conspirators caused investor H.T.C. of Greenwich, Connecticut, to send Check #55 in the amount of $7,900 to Blue Square at 225 Broadway Ste. 1905, New York, NY.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (15 U.S.C. §§ 77q(a), 77x and 18 U.S.C. § 2)
### Securities Fraud

1.     The allegations contained in paragraphs 1-8 and 11-59 of Count 1 are realleged and incorporated by reference as though fully set forth herein as describing a device, scheme and artifice to defraud and to obtain money and property by means of untrue statements of material facts and omissions necessary to make the statements made not misleading in light of the circumstances under which they were made, and to engage in a transaction, practice, and course

of business which would operate as a fraud and deceit upon the victim-investor-purchasers.

2.      As offered by the defendant and his co-schemers to investors, the CMLC stock identified in Paragraphs 13, 14 and 15 of Count 1 were securities within the meaning of the federal securities laws.

3.      It was part of the fraudulent scheme that defendant VIKTOR NOVOSSELOV and others known and unknown to the United States Attorney, caused Blue Square to offer the aforesaid securities to victim-investors through a scheme in which the defendant falsely described the securities as shares of CMLC purportedly a company that managed thousands of ATMs and which would have an initial public offering and/or a buy-out in the near future and as such investors would make a significant profit.

4.      On or about March 28, 2003, as listed below, for the purpose of executing the aforesaid device, scheme, and artifice to defraud, and to obtain money and property by means of untrue statements of material facts and omissions necessary to make the statements made not misleading, in light of the circumstances under which they were made, and to engage in a transaction, practice, and course of business which would operate as a fraud and deceit upon the victim-investor-purchasers, and attempting to do so, the defendant,

VIKTOR NOVOSSELOV,

did knowingly and willfully cause to be used the mails and certain means and instruments of communication in interstate and foreign commerce, directly and indirectly, in the offer and sale of securities in the form of shares in Cash Money Lending Corp., to victim-investor-purchaser H.T.C. as follows:

| Count | Date | Mailing/Means and Instruments of Interstate Commerce |
|-------|------|------------------------------------------------------|
| 2 | 3/28/03 | Check #308 in the amount of $140,000 from investor H.T.C. of Greenwich, Connecticut, sent by means and instruments of interstate commerce to Blue Square Management at 225 Broadway Suite 1905, New York, NY 10007 |

All in violation of Title 15, United States Code, Sections 77q(a) and 77x, and Title 18,

United States Code, Section 2._____

<u>FORFEITURE ALLEGATION UNDER 28 U.S.C. § 2461(c) & 18 U.S.C. 981(a)</u>
(Conspiracy to Commit Fraud)

Upon conviction of conspiracy to commit mail fraud as charged in Count One of this

Information, defendant NOVOSSELOV shall forfeit to the United States of America, pursuant to

18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all right, title, and interest in any and all

property, real or personal, which constitutes or is derived from proceeds traceable to violations of

mail fraud conspiracy, 18 U.S.C. §§ 371 and 1341, including but not limited to the following:

<u>Financial Accounts</u>:

(a)     Putnam Investments account no. 8196000128, held in the name of GALS
        LLC, with an address of 2334 E . 18th Street Brooklyn New York, 11229,
        c/o Infinet

(b)     Charles Schwab account no. 9118-6196,  held in the name of Marina
        Zimina, with an address of 60 Amsterdam Ave., Apt 8F, New York, NY
        10023-7419.

<u>Money Judgment</u>:

(c)     A sum of money equal to $3,700,000 in United States currency and all
        interest and proceeds traceable thereto, in that such sum in aggregate is
        property which constitutes or is derived from proceeds traceable to the
        mail fraud conspiracy, 18 U.S.C. § 371, as alleged in Count One, namely,
        conspiracy to violate 18 U.S.C. § 1341.

If any of the above-described forfeitable property, as a result of any act or omission of the

defendant, cannot be located upon the exercise of due diligence, has been transferred, sold to, or

deposited with a third party, has been placed beyond the jurisdiction of the court, has been

substantially diminished in value, or has been commingled with other property which cannot be

divided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as

incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendant(s)

- 20 -

up to the value of the forfeitable property described above.

All in accordance with 18 U.S.C. § 981(a)(1) as incorporated by 28 U.S.C. § 2461(c), and

Rule 32.2(a), Federal Rules of Criminal Procedure.

UNITED STATES OF AMERICA

/s/ _____
KEVIN J. O' CONNOR
UNITED STATES ATTORNEY

/s/ _____
ANTHONY E. KAPLAN
SUPERVISORY ASSISTANT
UNITED STATES ATTORNEY

/s/ _____
MICHAEL S.  McGARRY
ASSISTANT UNITED STATES ATTORNEY